**REVISED**

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 94-50472

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM JOSEPH KIRK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

February 3, 1997

Before POLITZ, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES,[*] STEWART, PARKER, and DENNIS, Circuit Judges.

PER CURIAM:

By virtue of an equally divided en banc court, the judgment of the district court is

AFFIRMED.

_____

[*]Judge Benavides was recused from consideration of this case.

ROBERT M. PARKER, Circuit Judge, joined by POLITZ, Chief Judge, KING, DAVIS, WIENER, STEWART, and DENNIS, Circuit Judges, would affirm for the following reasons:

In my view, there was a rational basis for Congress to conclude that post-1986 incidents of manufacture, transfer, and possession of machineguns fall within its power to regulate interstate commerce. Every circuit that has examined 18 U.S.C. § 922(o) -- both before and after *United States v. Lopez*, ___ U.S. ___, 115 S. Ct. 1624, 131 L. Ed. 2d 262 (1995) -- has determined that § 922(o) does not exceed the authority granted to Congress by the Commerce Clause.[**]

A careful reading of *Lopez* compels this conclusion. In *Lopez*, the Supreme Court held that Congress exceeded its Commerce Clause power by enacting § 922(q) which criminalizes possession of a firearm within 1000 feet of the grounds of a school, *see* § 921(a)(25), a small geographic area finitely circumscribed and related to education, a uniquely local concern. In contrast, the extensive history of federal firearm regulation and the national scope of § 922(o) distinguishes it from § 922(q). It is important to the understanding of *Lopez* that the Supreme Court intended to establish an outer limit to congressional authority, not to retreat from well-established Commerce Clause precedent. *United States v.*

---

[**]*See United States v. Rybar*, ___ F.3d ___ (1996 WL 740084 (3d Cir.(Pa.)); *United States v. Beuckelaere*, 91 F.3d 781 (6th Cir. 1996); *United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996); *United States v. Rambo*, 74 F.3d 948 (9th Cir.), *cert. denied*, ___ U.S. ___, 117 S. Ct. 72 (1996); *United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995); *United States v. Hale*, 978 F.2d 1016 (8th Cir. 1992), *cert. denied*, 507 U.S. 997, 113 S. Ct. 1614, 123 L. Ed. 2d 174 (1993).

*Kenney*, 91 F.3d 884, 887 (7th Cir. 1996).  As Chief Justice Rehnquist noted, "[S]ome of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further."  *Lopez,* ___ U.S. at ___ , 115 S. Ct. at 1634.

Simply stated, I believe that we should join the other circuits in holding that Congress had a rational basis for concluding that the manufacture, transfer and possession of machineguns substantially affect commerce and § 922(o) therefore is constitutional.

PATRICK E. HIGGINBOTHAM, Circuit Judge, joined by POLITZ, Chief Judge, DAVIS and WIENER, Circuit Judges, would affirm for the following reasons:

We are persuaded that a legislative judgment that possession of machine guns acquired after 1986 has a substantial effect on interstate commerce, particularly by facilitating the trade in illegal drugs, is supported by our judicial experience and facts about machine guns and interstate criminal activity common to public discourse. Congress did not exceed its power under the Commerce Clause, and we today correctly affirm this conviction.

I.

This case ultimately turns on the role of congressional findings in judicial review of congressional exercises of its commerce power. Our opinion in United States v. Lopez, 2 F.3d 1342 (5th Cir. 1993), aff'd, 115 S. Ct. 1624 (1995), stressed the absence of congressional findings of the relationship between Congress's regulation of guns near schools and its commerce power. We required that Congress justify its authority by findings. The Supreme Court affirmed our holding that Congress lacked authority to regulate possession of a gun in proximity to a school, but it did not adopt our rationale. Rather, the Court shied away from so direct an imposition of procedure upon the Congress. Nonetheless, the court did give weight to the absence of congressionally identified ties between the regulation and the commerce power. 115 S. Ct. at 1631-32.

Lopez, then, adhered to a rational basis standard of review. This deferential standard does not insist that Congress actually

4

make factual findings.  To the contrary, its tolerance of hypothetical, judicially supposed purposes and means gives the rational basis standard its deferential character.  Courts can assume a more activist role in judicial review by refusing to look to a basis for legislation not identified by Congress.  This elevates the standard of review, according significantly less deference to Congress.  Giving weight to the absence of congressional findings lies in the middle ground between an intrusive absolute insistence upon legislative findings and traditional rational basis inquiry. Congressional findings are not merely playthings of formalism.  They help define the respective roles of the courts and the Congress and the federal and the state governments.  So the role of findings demands our attention.  But their absence does not end our inquiry.  Here Congress made no findings.  We give weight to the absence of findings, but we do not find their absence controlling.    Under Lopez, we must continue to apply the rational basis test, which asks courts not to set aside congressional acts as exceeding the Commerce Clause power if the Congress could have found that the relevant intrastate activity has a substantial effect on interstate commerce.  This deference respects differences between the fact-finding of courts and legislative findings, differences of a constitutional order. Legislative "findings," relative to judicial findings, are untidy in their blending of empirical assessment and policy judgments. The difference reflects the fundamentally different roles of the judiciary and the Congress.  Congress must respond actively to

5

problems faced by political communities; its judgment is accented by its look to the future and its effort to offer solutions to social ills. The judicial decision looks backward, responding to the limits of a case or controversy. We must not forget these differences in inquiring what the legislature rationally could have found. Losing sight of these differences risks a blurring of the respective roles of Congress and the courts, a difference the rational basis test is intended to respect. On the one hand, courts have a constitutional duty to scrutinize congressional actions to ensure that Congress stays within its constitutionally enumerated powers; "if Lopez means anything, it is that Congress's power under the Commerce Clause must have some limits." United States v. Rybar, ___ F.3d ___, ___, 1996 WL 740084 at *22 (3d Cir. 1996) (Alito, J., dissenting). On the other hand, we must discipline our scrutiny to ensure that we are about the business of judicial review and not the business of social policy. Stated another way, respecting the policy-making role of majoritarian legislative bodies is not an empty recitation.

This familiar problem for rational basis review is especially awkward when the issue is whether an intrastate activity has a substantial effect on interstate commerce. Unless the Court follows Justice Thomas away from an effects test, see Lopez, 115 S. Ct. at 1642-51 (Thomas, J., concurring), we cannot escape this difficulty. Justice Breyer's elaborate study of education, guns, and commerce will continue to be commonplace, despite the reality that judicial searches for data that might have supported a

6

legislative finding raise the troubling prospect of the courts doing work the Congress ought to have done.  See id. at 1659-62 (Breyer, J., dissenting).  And as Justice Souter has pointed out, the doctrine of clear statement offers no escape.  See id. at 1655 (Souter, J., dissenting).  What the Supreme Court will do with the meaning of "substantial effect" remains to be seen.  These plastic words may lessen deference to Congress by judicial demands for empirical evidence as well as normative valuations of state and federal "interests."  Regardless of that future, according weight to the absence of legislative findings in close cases fairly accommodates these competing interests.  Cases are at least close when courts feel the need to conduct elaborate empirical studies to determine whether the facts support exercise of the federal commerce power.  If the facts were not within our easy reach, this would be a close case indeed, and the absence of findings would then tilt the outcome.  This simply states a limit upon the role of the courts in their inquiries into whether there is a rational basis for a legislative judgment.

## II.

In executing the rational basis test, we turn to facts bearing on the relationship between possession of machine guns and interstate commerce.  The prosecution has not aided our factual inquiry on this score.  But the concern over machine guns was hardly exotic.  To the contrary, concern over both the unique firepower of automatic weapons and the recent increase in their number was the subject of public discussion, as a simple repair to

7

the popular press makes plain.  That exercise also sheds light on the type of data and expert opinion available to the Congress.  A 1985 article in a national weekly magazine alerted Americans to the dangerous proliferation of machine guns and reported that "[t]he MAC-10 has become the side arm of choice for 'cocaine cowboys' and other drug smugglers."  Machine Gun U.S.A., NEWSWEEK, October 14, 1985, at 46.  According to the article, American gun dealers imported an average of 55,000 machine guns during the early 1980s.  In 1988, two years after the passage of § 922(o), the International Association of Chiefs of Police estimated that criminals possessed between 650,000 and two million automatic and semi-automatic weapons.  The Arms Race in Your Own Back Yard, U.S. NEWS & WORLD REPORT, April 4, 1988, at 24.  Presumably, the great percentage of these weapons were semi-automatic weapons and not machine guns.  In 1987, the DEA "seized an average of one machine gun a day," which led the press to report that "most of this ferocious firepower is deployed in connection with narcotics trafficking."  Id.  This sort of information, easily accessible to Congress, would support a legislative judgment that the possession of machine guns interferes with federal drug enforcement; that regulating the simple possession of machine guns acquired after 1986 is necessary to stop the rapid growth of the pool of supply.  Indeed, there is reason to think that Congress had these sorts of figures in mind when it enacted § 922(o).  See 1986 U.S.S.C.A.N. 1330 (noting that an alternative bill "prohibited the transfer and possession of machine

8

guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime").

The efficacy of § 922(o) also suggests that a legislative judgment of a strong tie between machine guns and federal crimes would have been valid. In 1983, ATF seized 871 machine guns and conversion kits; by 1985, that number had ballooned to 3,263. NEWSWEEK, October 14, 1985, at 46. After passage of § 922(o), however, this figure dropped dramatically. There were only 834 ATF machine gun seizures in fiscal year 1987, as opposed to 2,854 seizures in fiscal year 1986, a decrease of 71 percent. Semiautomatic Assault Weapons Act of 1989: Hearings before the Subcommittee on Crime of the Committee on the Judiciary, 101st Cong., 1st Sess. 354 (1989) (Appendix 9: "The 1986 Machine Gun Law Works"); Tony Freemantle, Police Groups Warm to Bill on Gun Control, HOUSTON CHRONICLE, March 19, 1989, at A1. These figures at least suggest that § 922(o) succeeded in substantially reducing the number of machine guns in the hands of criminals encountered by federal law enforcement. And the striking effectiveness of federal enforcement of the congressional freeze of the machine gun market gives us reason to think that in 1986 Congress could have mustered facts to support its legislative judgment that the ban would be effective in reducing the availability of machine guns to those confronting federal law enforcement, particularly in the drug trade. That other inferences might be drawn from the data or that there is conflicting data is no answer because our question is not

9

what judges think or prefer, but what rational judgment Congress could have made.

The bill that enacted § 922(o) also imposed on drug traffickers who use a machine gun a special ten-year sentence rather than the standard five-year sentence for other firearms. Pub. L. No. 99-308 § 104, 100 Stat. 456, 457 (May 19, 1986) (amending 18 U.S.C. § 924(c)(1)). Two years later, Congress thought it prudent to add another twenty years to this penalty. Pub. L. No. 100-690 § 6460, 102 Stat. 4373, 4373 (Nov. 18, 1988). This concerted attention to the dangers of automatic weapons is at odds with the suggestion that Congress's freeze on the market in machine guns rests on an irrational judgment about the ties between machine guns and drug dealers and about the effects of tolerating their possession after 1986. Federal law enforcement recognizes the importance of having such powerful weapons in confrontations with drug traffickers. In 1988, DEA, the primary enforcement agency in the regulation of drugs, moved away from shotguns and made 9-mm, 32-round weapons that can be fired automatically its "primary" weapons. U.S. NEWS & WORLD REPORT, April 4, 1988, at 24. These developments make it clear that it is at least rational to conclude that federal regulation of a distinct market in machine guns is part and parcel of federal drug regulation.

Judge Parker in his opinion for the panel found it important that Congress has done more here than outlaw simple possession of a machine gun. We agree. Not every possession is prohibited. Rather, the Congress has left lawful the possession of machine guns

10

manufactured before 1986 and lawfully possessed before that date. It is a crime to transfer any machine gun after 1986 or to possess a machine gun manufactured after that date. That is, Congress froze in place the market in machine guns. Judge Garwood made this point in his opinion for the panel in Lopez:

> Section 922(o) is restricted to a narrow class of highly destructive, sophisticated weapons that have been either manufactured or imported **after** enactment of the Firearms Owners' Protection Act, which is more suggestive of a nexus to or [e]ffect on interstate or foreign commerce than possession of any firearms whatever, no matter when or where originated, within one thousand feet of the grounds of any school.

2 F.3d at 1356 (emphasis in original) (footnote omitted). It is true that simple possession is the stated offense under the statute, but by excepting activity occurring before 1986, a proscribed possession, by definition, must have been the product of a post-1986 transfer, interstate or intrastate (putting to one side the remote cases of worn guns and, for the moment, cases involving conversion into fully automatic guns). Such careful regulation reflects legislative deliberation we are bound to respect.

Machine guns possess a firepower that outstrips any other kind of gun. Persons knowledgeable about firearms, such as those who campaign for repeal of gun regulations, usually emphasize that machine guns stand in a class of their own. See Assault Weapons: A View from the Front Lines: Hearing before the Committee on the Judiciary, 103d Cong., 1st Sess. 183, 185-86 (1994) (emphasizing that the cosmetic similarities between machine guns and semi-automatic assault weapons belie functional differences that make assault weapons more like hunting and target rifles than like

machine guns). The destructive capacity of machine guns puts them in the same category as explosives, which the federal government has heavily regulated for over twenty-five years, except machine guns have little lawful use. See Organized Crime Control Act of 1970, Title XI, § 1102(a), Pub. L. No. 91-452, 84 Stat. 953-55 (codified as amended at 18 U.S.C. §§ 842-843) (prohibiting, among other things, the storage of explosives without a federal permit); United States v. Dawson, 467 F.2d 668, 673 (8th Cir. 1972) ("There being a rational basis upon which Congress properly could have determined that the misuse of explosive materials is one activity which, as a class, affects commerce, the Government need not specifically allege and prove a connection between interstate commerce and the conduct made criminal by § 842 (h)."), cert. denied, 410 U.S. 956 (1973).

This fundamental difference between machine guns and other guns is reflected in the long history of machine-gun regulation by Congress. Initially, Congress used the taxing power to insist upon machine gun registration. See National Firearms Act of 1934, Pub. L. No. 474 §§ 2-6, 48 Stat. 1236, 1237-38. It soon turned to the Commerce Clause as a basis for restricting the market in machine guns. See Federal Firearms Act of 1938, Pub. L. No. 785, 52 Stat. 1250. That law remained in effect for thirty years, when Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (current version at 18 U.S.C. §§ 921-928), of which § 922(o) is now a part. Machine guns, then,

12

have not been the exclusive regulatory domain of the states.  Their
lethal force has produced a national response.

### III.

Those who urge that this legislation is unconstitutional are
at pains not to undercut the constitutionality of laws prohibiting
the simple possession of drugs.  Yet it is difficult to conclude
that Congress could not have rationally found that machine guns
play a large role in major drug transactions and thus that the
availability of these weapons of war has a substantial effect on
the interstate traffic in drugs.  Congress has acted on that effect
in providing that the use of a gun, otherwise lawful, in a drug
transaction brings substantially increased penalties.  18 U.S.C. §
924(c)(1).  We have repeatedly recognized firearms as one of the
drug dealer's "tools of the trade."  See United States v. Martinez,
808 F.2d 1050, 1057 (5th Cir.), cert. denied, 481 U.S. 1032 (1987).
The firepower of a machine gun puts it in a quite different
category from the handguns, shotguns, and rifles so popular with
sportsmen.  Its continuous fire puts the machine gun on a different
plane from the semi-automatic.  The routine cases on the criminal
docket in federal courts make the connection between machine guns
and major drug transactions undeniable.  Whether the effect is
"substantial" is less certain, as we have explained.  See supra at
5-7.  But we need conduct no elaborate study.  As shown above, the
writing of the popular press and the scale of congressionally-set
penalties demonstrate that the baseline of public debate assumes a
heavy use of machine guns in drug-related crimes.  Significantly,

13

our cases provide anecdotal information that meshes with this data and together would make § 922(o) a rational way to cabin both violence attending the drug trade and the trade itself.[***]   The

---

[***]A brief survey of recent federal cases reveals many examples.  See, e.g., Smith v. United States, 113 S. Ct. 2050, 2052 (1993) (defendant in possession of a fully automatic MAC-10 and MAC-11 machine gun attempts to buy cocaine by selling the MAC-10, a gun that "apparently is a favorite among criminals" because it "can fire more than 1,000 rounds per minute"); United States v. Powell, 469 U.S. 57, 59 (1984) (search of defendant's car yields, among other things, two kilograms of cocaine and a machine gun); County Court v. Allen, 442 U.S. 140, 143 (1979) (loaded machine gun and more than a pound of heroin found in the trunk of defendants' car); United States v. Jones, 102 F.3d 804, 806 (6th Cir. 1996) (cocaine dealers attempt to sell federal agents a MAC-10, a MAC-11, and an AK-47, two of which have obliterated serial numbers); United States v. Agis-Meza, 99 F.3d 1052, 1054 (11th Cir. 1996) (two defendants charged with violation of § 922(o) plead guilty to possession of marijuana); United States v. Alerta, 96 F.3d 1230, 1233 (9th Cir. 1996) (two brothers arrested for methamphetamine distribution are found in possession of two fully automatic weapons: a MAC-10 and a converted TEC-9); United States v. Hawthorne, 94 F.3d 118, 120 (4th Cir. 1996) (automatic pistols used during drug transactions); U.S. v. Ulloa, 94 F.3d 949, 950-51 (5th Cir. 1996) (defendant trading cocaine for five MAC-10's, 48 M-16's, one UZI, and other weapons) petition for cert. filed No. 96-6914 (U.S. November 25, 1996); United States v. Cannon, 88 F.3d 1495, 1505 (8th Cir. 1996) ("The record in this case contains evidence that a machine gun is a drug dealer's most prized  possession."); United States v. Moskovits, 86 F.3d 1303, 1311 (3d Cir. 1996) (affirming a finding that a defendant convicted of distributing cocaine committed perjury when he denied owning a machine gun) petition for cert. filed No. 96-6646 (U.S. September 17, 1996); United States v. Blue, 78 F.3d 56, 58 (2d Cir. 1996) (DEA agents discover a machine gun under a mattress while searching an apartment during a cocaine investigation); United States v. Garcia, 77 F.3d 274, 275 (9th Cir. 1996) (sheriff's deputies discover a machine gun in "a typical stash house where drugs are stored and weapons are kept to protect the merchandise"); United States v. Buchanan, 70 F.3d 818, 824-25 (5th Cir. 1995) (9mm fully automatic pistol found in car with 280 grams of crack cocaine), cert. denied, 116 S. Ct. 1366 (1996); United States v. Murphy, 69 F.3d 237, 239 (8th Cir. 1995) (defendant convicted of attempt to manufacture methamphetamine, use of a firearm in relation to a drug offense, and possession of a machine gun), cert. denied, 116 S. Ct. 1032 (1996); United States v. Brantley, 68 F.3d 1283, 1286 (11th Cir. 1995) (defendant convicted of both possession of cocaine with intent to distribute and use of a fully automatic firearm in the

14

commission of a drug offense), cert. denied, 116 S. Ct. 964, 116 S. Ct. 1334 (1996); United States v. Zermeno, 66 F.3d 1058, 1060 (9th Cir. 1995) (marijuana, packaging materials, money counters, camouflage gear, two assault rifles, a machine gun, and 1,550 rounds of ammunition found in "stash house"); United States v. Luciano-Mosquera, 63 F.3d 1142, 1149 (1st Cir. 1995) (M-16 carried onto beach during off-loading of cocaine base from boat), cert. denied, 116 S. Ct. 1879 (1996); United States v. Melendez, 60 F.3d 41, 44 (2d Cir. 1995) (heroin trafficking operation accumulates a number of machine guns and other firearms that were used to protect its operations), cert. denied, 116 S. Ct. 1020, 116 S. Ct. 900 (1996), 116 S. Ct. 429, 116 S. Ct. 258 (1995); United States v. Messino, 55 F.3d 1241, 1245 (7th Cir. 1995) (cocaine dealer sells a fully automatic machine gun with a silencer to a confidential informant); United States v. Davis, 53 F.3d 638, 639 (4th Cir. 1995) (probation of defendant who pled guilty to distributing cocaine revoked after he is seen carrying a machine gun on a college campus); United States v. Taffe, 36 F.3d 1047, 1048-49 (11th Cir. 1994) (UZI machine pistol equipped with a silencer used in heist of three bales of cocaine and fired at police officers); United States v. Thomas, 12 F.3d 1350, 1361-62 (5th Cir. 1994) (AR-15 rifle modified to fire as a machine gun used by defendant for protection because of "his line of business" in conspiracy to distribute cocaine, amphetamine, methamphetamine and marijuana), cert. denied, 114 S. Ct. 1861, 114 S. Ct. 2119 (1994); United States v. Garcia, 997 F.2d 1273, 1277 (9th Cir. 1993) (machine gun used to protect and embolden drug dealer found in house with a kilo of heroin, 4.5 kilos of cocaine, and 1.24 grams of cocaine base); United States v. Sims, 975 F.2d 1225, 1230 (6th Cir. 1992) (ATF agents discover two AR-15 rifles, converted to fire fully automatically, and 257 rounds of ammunition in the back seat of a car in connection with the arrest of defendants attempting to buy $337,500 worth of cocaine); United States v. Capote-Capote, 946 F.2d 1100, 1102-04 (5th Cir. 1991) (machine gun used to protect kilogram of cocaine), cert. denied, 504 U.S. 942 (1992); United States v. Moore, 919 F.2d 1471 (10th Cir. 1990) (loaded British Sten machine gun found in open closet of room containing cocaine, ziplock bags, weighing scale, dealing records, $3,400, and a calculator); United States v. Rogers, 921 F.2d 1089 (10th Cir. 1990) (same facts as recited in Moore), modified, 925 F.2d 1285 (10th Cir.), cert. denied, 501 U.S. 1211 (1991); United States v. Lucas, 932 F.2d 1210, 1223-24 (8th Cir.) (along with thirteen other guns, machine gun "kept at the ready" to safeguard crack house and facilitate illegal manufacture and trade in crack cocaine), cert. denied, 502 U.S. 869, 502 U.S. 949, 502 U.S. 991 (1991), 502 U.S. 1100 (1992); United States v. Matra, 841 F.2d 837, 839 (8th Cir. 1988) (machine gun, along with eight other weapons, made the crack house a "veritable fortress").

cases is high enough to conclude that Congress would have had a rational basis for a legislative judgment that prohibiting their intrastate possession would have a substantial effect on the interstate commerce in illegal drugs.

This rationale would not "convert the commerce power into a reserved 'general federal police power'" (quoting Lopez, 115 S. Ct. at 1632). As observed, machine guns are very different weapons from guns without the capability of automatic fire and have been the subject of federal commerce regulation for nearly sixty years. We would expect a national rather than a state-by-state regulatory pattern of, say, anti-tank bazookas, plastic explosives, plutonium, or other tools of terrorists. Federal regulation of machine guns, as distinguished from other guns, does not bring similar invasions of traditional state interests. Although § 922(o) and § 922(q) both criminalize the possession of certain guns, § 922(o) ought not be brushed off as a mere "clone" of § 922(q).

Of course, the Lopez Court insisted that we distinguish between the regulation of crime and the regulation of commercial activity. 115 S. Ct. at 1630-31. This case differs from Lopez in the critical respect that criminals use machine guns to evade regulation of the national drug trade while guns near schools have a negligible effect on the traditionally local activity of public education, which is not itself commercial. Crime can be interstate business. And local intrastate criminal activity can have a substantial effect on that interstate activity. Indeed, Congress might rationally conclude that the relationship between "local

16

possession" of machine guns and the drug trade is even more compelling than the ties between local loan sharking and organized crime. See Perez v. United States, 402 U.S. 146, 157 (1971) ("[L]oan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and rich alike and siphons funds from numerous localities to finance its national operations.").

The judiciary's role in policing the process of federalism brings hard calls, including the task of distinguishing national economic activity from local crime. Lopez is not merely symbolic jurisprudence. Rather, it announces that there are yet limits upon Congress's use of the commerce power to make a federal case out of traditionally local concerns, particularly in criminal law enforcement. That said, we part company with the declaration that § 922(o) is an invasion of the state's traditional police power. That the Congress has attached a criminal penalty to the possession of a machine gun or storage of explosives does not alone mean that it has invaded the traditional police power of the states. With respect, that announces an outcome, not a rationale.

There is no social utility in the distribution of cocaine and marijuana, and their interstate character is undeniable. It is no surprise, then, that Congress "regulates" the national market in these drugs by banning them, a ban that rationally extends to simple possession. There is little social utility in acquiring since 1986 operable machine guns or in making them. They are not sporting weapons; they are weapons of war. They are guns in the

17

same sense that pussycats and tigers are both members of the cat family. The courts have learned that a machine gun's destructive capacity makes it highly useful for protecting commerce in contraband such as narcotics.

Given the rapid influx of machine guns, it is hardly irrational to conclude that meaningful regulation of their use in lines of interstate commerce requires regulation of this intrastate possession. The attempt to distinguish drugs and machine guns on the basis of fungibility fails to appreciate the fact that many guns can easily be converted from semi-automatic to fully automatic. See, e.g., United States v. Branch, 91 F.3d 699, 736-37 (5th Cir. 1996) (affirming a § 922(o) conviction where the defendant used conversion kits and instructional books and videotapes to manufacture fully automatic weapons out of semi-automatic weapons). News reports describe the process as "so low tech on some brands that [ATF] agents . . . have seen it done with a paperclip." U.S. NEWS & WORLD REPORT, April 4, 1988, at 24. As with drugs, identifying and tracing the fully automatic nature of machine guns is often impossible.

Efforts to minimize the consequences of striking down this statute by reassuring that Congress can cure the defects it finds by inserting a jurisdictional element are empty of content: for example, it can provide penalties for possession of weapons that are "in or affecting commerce." With deference, this velvet over the sword in fact erodes the logic of an otherwise not insubstantial argument. If the present statute cannot be sustained

18

because Congress could not rationally have made a legislative judgment of the need to freeze the post-1986 market, there is little federal regulatory scope left; that reality should be forthrightly acknowledged. If a legislative decision to freeze the class is irrational, proof that an individual member of the class had a substantial effect on commerce in a given case is problematic if "substantial effect" is accorded a constant meaning. So those who would strike this statute cast themselves as protecting state interests by insisting that the Commerce Clause empowers Congress to outlaw only those machine guns where in a specific case the government proves that the use of the machine gun was in commerce or affecting commerce. The irony is that this requirement is more intrusive of state interests than the test we apply and they reject. It is more tolerant of federal intrusion because it may be met by showing merely that a gun "has previously traveled in interstate commerce." United States v. Bass, 404 U.S. 336, 350 (1971). That is, this minimal nexus to commerce could give Congress more latitude in exercising its federal commerce power than the substantial-effects test we have employed here. A case-by-case inquiry into whether the defendant possessed a gun that was once in interstate commerce, even "after any number of intermediate sales within the State and after any lapse of time," United States v. Sullivan, 332 U.S. 689, 693 (1948), would allow federal regulation of items that, taken as a class, have virtually no effect on interstate commerce. It would concede congressional power to outlaw possession of guns in general, an upset of a

19

traditional state-federal balance and a concession we are not persuaded to make. Lopez would indeed look more like symbolic jurisprudence with little real implementation of the federalist arrangement of our Constitution. After all, few guns have never crossed a state line. It is not for us to say that Bass cannot survive Lopez. We would not embrace it, however, to support a rejection of a less intrusive inquiry.

In general, judges are not equipped by training to engage in elaborate empirical studies; more importantly, the courts are institutionally ill-equipped. Deference to Congress does not require courts to leave their traditional roles by pursuing empirical research. But it does require courts not to ignore the obvious, at least when the obvious is born of judicial experience. We need look no further than our considerable experience with the drug market and the role of automatic weapons in that activity. Based on that experience, we are comfortable in concluding that Congress could have rationally found the required nexus between its careful regulation of the possession of machine guns and the interstate commerce in, for example, illegal drugs, as well as the attendant commerce in machine guns alone. The federal government has the power under the Commerce Clause to wage the war on drugs. It equally has the power to freeze the escalating destructive power of the weapons of that war, the automatic firepower drawn by the drug trade.

Automatic and non-automatic weapons fire on different planes, functionally and legally. Guns without the capability of automatic

20

fire are lawfully found in the hands of thousands of persons across the country. The states have traditionally regulated these weapons, indeed virtually all guns, except the machine gun. We weigh the absence of congressional findings against the constitutionality of § 922(o), but given the facts we have outlined conclude that the absence of an invasion of a traditional state interest tilts this case in favor of the constitutionality of the statute. Saying so pulls no teeth from Lopez and sounds no retreat from the judicial scrutiny of efforts to make federal cases of state crimes.

EDITH H. JONES, Circuit Judge, joined by GARWOOD, JOLLY, SMITH, DUHE', BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit Judges, would reverse for the following reasons:

This appeal has provided an occasion for our *en banc* court to consider the breadth of Congress's power to enact criminal laws under the Commerce Clause in light of *United States v. Lopez*, __ U.S. __, 115 S. Ct. 1624 (1995). The specific issue is whether Congress breached its Commerce Clause authority in enacting 18 U.S.C. § 922(o), which was the basis for appellant Kirk's conviction for the wholly intrastate possession of a machinegun. Half of the judges participating in this en banc[****] rehearing conclude that *Lopez* has more than mere symbolic significance. Carefully applied, it compels the conclusion that the § 922(o) ban on mere intrastate possession of a machinegun exceeds Congress' authority "[t]o regulate Commerce . . . among the several States." U.S. Const., Art. 1, § 8, cl.3. The other half of the participating judges disagree with this conclusion, although their reasoning differs. Kirk's conviction must be affirmed by an equally divided court, but the importance and recurring nature of these issues lead us to publish this opinion.

## I. BACKGROUND

William J. Kirk was charged in a four-count indictment with violations of 18 U.S.C. § 922(o)(1988). The indictment charged Kirk with two counts of unlawful possession of a machinegun (Counts One and Three); and two counts of unlawful transfer of a

---

[****]Judge Benavides was recused from consideration of this case.

22

machinegun (Counts Two and Four).[*****]  The possession counts make no mention of interstate commerce or of any connection between Kirk's machinegun or his possession of it with commerce, interstate or otherwise.  Kirk moved to dismiss the indictment, contending in part that § 922(o) exceeds Congress' delegated powers under the Commerce Clause in that it punishes the transfer or possession of a machinegun with no showing that the intrastate transfer or possession affects interstate commerce.  The district court denied the motion to dismiss.  Kirk then pled guilty to Count One for unlawful possession of a machinegun, reserving his right to appeal the denial of his pre-trial constitutional challenge to § 922(o).

A divided panel of this court rejected Kirk's constitutional challenge and affirmed his conviction.  *United States v. Kirk*, 70 F.3d 791 (5th Cir. 1995), *reh'g en banc granted*, 78 F.3d 160 (5th Cir. 1996).  Because this case poses similar constitutional questions to those presented in *United States v. Lopez*, __ U.S. __, 115 S. Ct. 1624 (1995), we granted rehearing *en*

---

[*****]For purposes of 18 U.S.C. § 922(o), a "machinegun" is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b)(1988); *see* 18 U.S.C. § 921(a)(23).

*banc*, vacating the panel opinion to determine the constitutionality of the § 922(o) ban on the possession of machineguns.[******]

## II. PREFACE

The language and legislative history of § 922(o) and a brief discussion of *Lopez* form a backdrop for further analysis.

### A. Section 922(o)

In 1986 Congress amended the Gun Control Act of 1968, 18 U.S.C. §§ 921-28, with the passage of the Firearms Owners' Protection Act (FOPA), Pub. L. No. 99-308, 100 Stat. 449 (1986). Section 102(9) of FOPA added § 922(o) to the existing statute. 100 Stat. at 453. Section 922(o) provides:

> (o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to--
>
> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o). Section 922(o) became effective May 19, 1986. *See* FOPA § 110(c), 100 Stat. at 461 (effective date).

The legislative history of § 922(o) is sparse. *See* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and*

---

[******]With certain exceptions, § 922(o) bans both the transfer and possession of machineguns. *See infra* part II. We need not consider here the constitutionality of § 922(o)'s restriction on the transfer of machineguns. The prohibition on the transfer of machineguns raises different constitutional questions than those raised by § 922(o)'s ban on their mere possession.

*Legal Perspective*, 17 Cumb. L. Rev. 585, 669-71 (1987). Section 922(o) was added to FOPA as a last minute amendment on the House floor and its provisions were not debated. *See United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995); *United States v. Lopez*, 2 F.3d 1342, 1356 (5th Cir. 1993), *aff'd*, __ U.S. __, 115 S. Ct. 1624 (1995); 132 Cong. Rec. H1750-52 (daily ed. April 10, 1986); Hardy, *supra*, at 670. The only apparent explanation for § 922(o) is a statement from its sponsor, Representative Hughes, who, rushing to explain his position before the time for debate expired, stated, "I do not know why anyone would object to the banning of machineguns." 132 Cong. Rec. H1750 (daily ed. April 10, 1986). No other reference to § 922(o) appears in committee reports or elsewhere, with the exception of a brief Senate colloquy primarily concerned with the scope of the provision's exemptions as they relate to machinegun manufacturers and government-authorized machineguns. 132 Cong. Rec. S5358-62 (daily ed. May 6, 1986); Hardy, *supra*, at 670-71 & nn. 462-463.[*******] Thus, the legislative

_____

[*******]Following a colloquy between Senators Hatch and Dole concerning the exemptions contained in § 922(o), Senator Metzenbaum expressed concern that the colloquy did not express the correct interpretation of the amendment. In partial response, Senator McClure stated: "I know that the Senator [Metzenbaum] from Ohio has interposed a reservation with respect to my request. I take this time only to say to the Senator from Ohio that this discussion [concerning § 922(o)] is up at all because the other body injected some language at the very last minute, literally, of their debate, and there is no legislative history as to what that language means. There are a substantial number of House Members as well as other interested parties who have asked questions about what it means; and what we are trying to do is provide some legislative history as to our understanding of what the House provision means, since the House itself had no legislative history on this subject." 132 Cong. Rec. S5361-62 (daily ed. May 6, 1986).

25

history of § 922(o) itself provides no insight into the relationship between § 922(o) and interstate commerce.

## B. United States v. Lopez

In *United States v. Lopez*, __ U.S. __, 115 S. Ct. 1624 (1995), the Supreme Court considered the constitutionality of 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V), which banned the possession of firearms near a school and which had been overturned in this court. *United States v. Lopez*, 2 F.3d 1342 (5th Cir. 1993).******** The Court recognized that Congressional power over interstate commerce under the Commerce Clause extends to (1) legislation regulating "the use of the channels of interstate commerce;" (2) laws regulating and protecting "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) regulations of intrastate activities that have a substantial effect on interstate commerce. *Id*. at __, 115 S. Ct. at 1629-30.

Each of these categories of cases represents a distinct way, exemplified by the Court's chosen citations, to describe the impact of federal legislation upon interstate commerce. *See United States v. Robertson*, ___ U.S. ___, 115 S.Ct. 1732 (1995). Before going further, we note that although *Lopez* does not explicitly abandon the deferential rational basis standard of review, *see,*

--------

********Section 922(q)(1)(A) was enacted as part of the Gun-Free School Zone Act of 1990 and provides: "It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."

*e.g., Hodel v. Virginia Surface Mining & Reclamations Ass'n, Inc.*, 452 U.S. 264, 276-80, 101 S.Ct. 2352, 2360-61 (1981), neither does the Court defer unblinkingly to Congress's judgment. Indeed, the Court's citations emphasize that it is the judicial duty ultimately to review conformity of legislation to the Commerce Clause. *Lopez*, 115 S.Ct. at 1629 n.2; *see also Hodel*, 452 U.S. at 311, 101 S.Ct. at 2391-92 ("simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.") (Rehnquist, J. concurring in judgment). As *Lopez* demonstrates, exercise of this duty requires independent judicial scrutiny of the reasons advanced to explain why the regulation is necessary to protect interstate commerce. Even a statutorily imposed requirement of a jurisdictional nexus to interstate commerce will not insulate a provision from judicial review. *See, e.g., United States v. Pappadopoulos*, 64 F.3d 522, 527 (9th Cir. 1995).**********

Moving to a more detailed consideration of the *Lopez* categories, regulation of the "channels of interstate commerce," the first category, is limited to direct regulation of the interstate channels themselves. The cases cited in *Lopez,* or by

----

**********". . . where Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings, the government must satisfy the jurisdictional requirement by pointing to a "substantial" effect on or connection to interstate commerce." *Pappadopoulos*, 64 F.3d at 527 (holding arson directed against a private home not sufficiently related to interstate commerce).

its reference to *Perez v. United States*, 402 U.S. 146, 91 S. Ct. 1357, 1359 (1971), to describe the first category involve statutes that contain an express jurisdictional nexus element. *See*, *e.g.*, 18 U.S.C. §§ 2312-2315 (interstate shipment of stolen goods); 18 U.S.C. § 1201 (interstate transport of kidnaping victims); *United States v. Darby*, 312 U.S. 100, 61 S. Ct. 451 (1941) (regulation of working conditions in the production of goods "for interstate commerce"). This category must be limited to legislation that specifically reaches interstate transfers, possessions, and transactions and business "engaged in commerce." *United States v. Robertson, supra* at ___, 115 S.Ct. at 1733 (goldmine "engaged in commerce").

The second category of Commerce Clause power permits laws regulating or protecting instruments of interstate commerce, or persons or things in interstate commerce, even though the threat may derive from intrastate activity. The Court cites in this connection the Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833 (1914), which upheld rate regulation of a railroad engaged in interstate commerce, and *Southern Railway Company v. United States*, 222 U.S. 20, 32 S.Ct. 2 (1911), permitting regulation of interstate railway safety. The Court also cites a statute criminalizing the destruction of aircraft used in interstate commerce, 18 U.S.C. § 32, and vehicle thefts from interstate shipments, 18 U.S.C. § 659. This category includes regulation or protection pertaining to instrumentalities or things as they move in interstate commerce.

With regard to the third category of cases, as the Court

28

put it, "the pattern is clear." *Lopez*, ____ U.S. at ____, 115 S.Ct. at 1630. Federal regulation of even intrastate economic activity will be sustained if the activity substantially affects interstate commerce. The Court's citations again bear out its purpose. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276-280, 101 S.Ct. 2352, 2360-61 (1981) (upholding regulation of intrastate coal mining); *Perez v. United States*, *supra* (intrastate extortionate credit transactions); *Katzenbach v. McClung*, 379 U.S. 294, 299-301, 85 S.Ct. 377, 381-382 (1964) (restaurants utilizing substantial interstate supplies); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252-253, 85 S.Ct. 348, 354-355 (1964) (inns and hotels catering to interstate guests). All of the cases involved economic regulations or legislation bearing on commercial activity, and in those cases, the intrastate activity either substantially affected interstate commerce, or it had to be regulated in order not to undercut a federal commercial regulatory scheme. *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1631.**********

The Court majority agreed that § 922(q) neither regulates "the channels of interstate commerce" nor protects "an instrumentality of interstate commerce or a thing in interstate commerce," *id*. at __, 115 S.Ct. at 1630. The problem in *Lopez*

---

**********See also United States v. Robertson, supra*, ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely intrastate commercial activities that nonetheless have substantial interstate effects."); *United States v. DiSanto*, 86 F.3d 1238, 1245 (1st Cir. 1996).

centered on the third category of Commerce Clause power.  There are three steps to the Court's analysis of the substantial effects test.  The threshold question is whether the local activity sought to be regulated is commercial in nature, or whether its regulation is necessary to effectuate federal regulation of a larger commercial activity.  The majority agreed that the ban on possession of a gun in a school zone fails to "substantially affect any sort of interstate commerce." *Id*. at \_\_, 115 S.Ct. at 1634.  Further, § 922(q) "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id*. at 1630-31.  The majority easily rejected the notion that the act of possessing a gun in a school zone is subject to federal regulation because, viewed in the aggregate, such acts substantially affect interstate commerce.  *Lopez*, 115 S.Ct. 1631.  What this means is that non-commercial intrastate acts may not be deemed commercial, for purposes of extending federal regulation, simply by considering them *en masse*;[***********] such activities are only subject to federal regulation if their regulation is essential to a larger economic regulatory scheme.  *Lopez* thus holds that "commercial activity" is not a definitional vacuum waiting to be filled by a creative Congress and judges.

---

[***********]This reasoning does not undermine *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82 (1942), because the farmer's activity there, albeit local, directly distorted the federally controlled market for wheat.  *Lopez*, 115 S.Ct. at 1630.  Nevertheless, the Court's analysis does not hold that any intrastate commercial activity is regulable by Congress simply because it is commercial -- the substantial effects test must be met to ensure a sufficient connection with interstate commerce.

While the Court acknowledges that characterizing an intrastate activity as commercial or non-commercial may create some legal uncertainty, 115 S.Ct. at 1633, the Court's conclusion regarding the purely criminal provision, § 922(q), caused no interpretive difficulty to the majority. *Lopez* sends a clear cautionary signal that federal criminalization of intrastate noneconomic activity, when such regulation is not essential to a broader regulation of commercial activity, will have difficulty satisfying the substantial effects basis for Commerce Clause regulation.

The second element of the substantial effects test is whether the statute contains a jurisdictional nexus to interstate commerce. *Lopez* commented on the absence of any jurisdictional nexus requirement in § 922(q) that would insure, through case-by-case inquiry, that a particular firearm possession substantially affects interstate commerce. *Lopez* illustrated how a jurisdictional nexus requirement could save a statute from Constitutional infirmity by describing *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515 (1971). The provision at issue in *Bass* criminalized, *inter alia*, a felon's possession of a firearm "in commerce or affecting commerce." Former 18 U.S.C. § 1202(a). The government convicted Bass without offering proof of a nexus to interstate commerce. The Court reversed the conviction for this omission and "thus interpreted the statute to reserve the Constitutional question whether Congress could regulate, without more, the 'mere possession' of firearms." *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1624 (citing *Bass*, 404 U.S. at 339, n.4, 92 S.Ct. at

31

518, n.4). As previously noted, a jurisdictional nexus requirement does not *ipso facto* validate a statute against an as-applied Commerce Clause challenge,\*\*\*\*\*\*\*\*\*\*\*\* but its existence is reassuring against a facial challenge.

The final element of the substantial effects inquiry is whether there are limits in the statute that mark a boundary of some sort between matters of truly national concern and those traditionally subject to state regulation. In this connection, the Court acknowledged that legislative findings, while not legally necessary, would facilitate judicial review of the substantial effects question. *Lopez*, \_\_\_\_ U.S. at \_\_\_\_, 115 S.Ct. at 1631-32; *Perez, supra*, 402 U.S. at 156, 91 S.Ct. at 1362. No such findings accompanied § 922(q), however. The Court also agreed with the Fifth Circuit\*\*\*\*\*\*\*\*\*\*\*\* that legislative findings pertaining to previous firearms statutes could not be imported into the analysis of § 922(q). \_\_\_\_ U.S. at \_\_\_\_, 115 S.Ct. at 1632. The Court finally rejected both the "costs of crime" and "national productivity" theories proffered by the federal government to demonstrate substantial interstate commerce effects, and it rejected Justice Breyer's equation of education with commercial activity. 115 S.Ct. at 1632-34. Neither of these attenuated strings of logic, according to *Lopez*, furnishes any principled

---

\*\*\*\*\*\*\*\*\*\*\*\**See United States v. Collins*, 40 F.3d 95, 99-101 (5th Cir. 1994) (robbery of an individual victim lacks sufficient nexus to interstate commerce to prosecute under Hobbs Act).

\*\*\*\*\*\*\*\*\*\*\*\**United States v. Lopez*, 2 F.3d at 1366.

32

limit on federal power in areas such as criminal law enforcement or education, where states have traditionally been sovereign.

### III. DISCUSSION

On its face, § 922(o) seems a clone of § 922(q), the provisions struck down in *Lopez*. The statute bans for present purposes "mere possession" of machineguns manufactured or imported after 1986; it is supported neither by a jurisdictional nexus requirement nor by salvaging legislative findings; it is a criminal, not an economic regulatory provision; and it clearly overlaps state and local law enforcement authority. Other circuit courts and other judges in this court, however, have not seen it that way,[*] although their reasons for upholding the statute differ significantly. Most of these cases err by assuming that every intrastate possession of machineguns involves interstate commerce. That error leads to misapplication of the first and second categories of Commerce Clause cases described by *Lopez*, and to an untenable distinction between § 922(o) and § 922(q) when the third *Lopez* category is considered. The errors in other cases are best exposed by our analysis,[**] which will discuss § 922(o)

---

[*]*United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996); *United States v. Beuckelaere*, 91 F.3d 781 (6th Cir. 1996); *United States v. Rambo*, 74 F.3d 948 (9th Cir. 1996); *United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995); *United States v. Rybar*, ___ F.3d ___, 1996 WL 740084 (3d Cir. Dec. 30, 1996).

[**]Judge Parker and Judge Higginbotham imply that this analysis strays from the rational basis test for evaluating the constitutionality of legislation. Not so. First, as a general principle, following *Lopez*, the rational basis test will apply the data created, referenced or expressed by Congress in conjunction with an enactment to the three aspects of federal commerce clause power described in *Lopez*. That is what we have done here, hampered

33

under each category of *Lopez*, and which takes *Lopez* seriously as establishing at least an outer boundary on Congress's criminal jurisdiction under the Commerce Clause.***************

### A. Does § 922(o) Regulate "Channels of" or "Things in" Interstate Commerce?

The Government contends that § 922(o) may be justified under either of the first two *Lopez* categories, as a regulation of the channels of interstate commerce or of a thing in interstate commerce. There is circuit court support for each position. *See*

---

by the absence of data from Congress concerning how banning the possession of machineguns nationwide involves or substantially affects interstate commerce. Second, the rational basis test assumes the existence of data created or referenced in the legislative process whose rationality can be analyzed. Here, there are no relevant data relating the ban on mere intrastate possession of machineguns by § 922(o) to Congress's interstate commerce jurisdiction. There are no legislative findings, no committee reports, and no pertinent Congressional debate that "would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye. . . ." *Lopez*, 115 S.Ct. at 1632. Most important, there is neither an explicit jurisdictional nexus requirement nor any other tie to interstate commerce apparent from the statutory architecture. It is not this court's responsibility or place to invent a rational basis for Congress. Third, the absence of such data mirrors the situation before the Court in *Lopez* and reinforces the consistency between these two cases. In *Lopez*, Congress had not endeavored in § 922(q) to express any connection between interstate commerce and possession of a gun in a school zone. Unlike the majority, the dissent there was willing to create a factual backdrop for the statute, just as Judges Parker and Higginbotham seek to do here.

***************It would be a mistake to argue that because Justices Kennedy and O'Connor concurred in *Lopez* and joined a separate writing, the *Lopez* analysis is not definitive. The two justices joined and endorsed Justice Rehnquist's majority opinion. ("As the Chief Justice explains, unlike the earlier cases to come before the Court, here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus." *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1640 (Kennedy, J., citing Rehnquist opinion).

34

*United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) (upholding § 922(o) as regulation of a thing in interstate commerce); *United States v. Rambo*, 74 F.3d 948 (9th Cir. 1996) (§ 922(o) valid as regulation of channels of interstate commerce); *United States v. Beuckelaere*, 91 F.3d 781 (6th Cir. 1996) (§ 922(o) valid under all three *Lopez* categories); *but see United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996) (§ 922(o) upheld only under substantial effects prong of *Lopez*).

### 1.    The Channels of Interstate Commerce

Recourse to the first two *Lopez* categories suffers initially, however, from a serious factual error.  Proponents of the constitutionality of § 922(o) assume that every possession of a machinegun manufactured after May 19, 1986, excepting only the narrow class of possessions permitted in the statute, connotes that the gun traveled or was transferred in interstate commerce.  These decisions overlook that an automatic weapon may be created by modifying a semiautomatic weapon, *see United States v. Jones*, 976 F.2d 176, 178 (4th Cir. 1992), *cert. denied* 508 U.S. 914, 113 S.Ct. 2351 (1993) (describing home conversion of shotguns), or that it may evolve from ordinary wear and tear on a semiautomatic firearm. In *United States v. Anderson*, 885 F.2d 1248, 1250-51 (5th Cir. 1989) (*en banc*), this court recognized that "[s]everal of the most popular shotgun models, many handguns, and not a few rifles" can by "either wear and tear or a simple operation" become "machineguns" within the statutory definition. Section 922(o) would therefore prohibit the simple possession of an ordinary semi-automatic pistol

whose sear wore off in 1987. Shorn of the misunderstanding that illegal possession cannot occur without illegal transfer[***************], § 922(o) plainly reaches mere intrastate possession of machineguns as well as possession of machineguns which have illegally moved or been transferred in interstate commerce. Any decision upholding § 922(o) under *Lopez* must come to grips with this reality.

*Rambo*, for instance, seeks to justify § 922(o) as regulating the channels of interstate commerce because it is "an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." *Rambo*, 74 F.3d at 951, citing *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1630. But because § 922(o) also prohibits purely intrastate possession of machineguns, *Rambo*'s logic proves too much. The first *Lopez* category, as earlier described, included cases that were distinguished by express jurisdictional nexus requirements to movements or transactions in interstate commerce. In *Kenney*, the court rejected the channels of commerce rationale for § 922(o) on this basis:

> . . . although it may be true that Congress must regulate intrastate transfers and even mere possessions of machineguns in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce.

91 F.3d at 889.

*Lopez* summarily rejected the argument that banning firearm possession in school zones regulates the channels of

---

[***************]*United States v. Kirk*, 70 F.3d 791, 796 (5th Cir. 1995); *Rambo, supra,* 74 F.3d at 952 (same); *Beuckelaere, supra*, 91 F.3d at 783 (same).

36

commerce. Section 922(o) does not more clearly express a nexus to channels of commerce than did its virtual clone, § 922(q), the *Lopez* provision. To disregard the similarity of the provisions trifles with *Lopez*. Section 922(o) is limited neither to transfers nor to possession in or even affecting interstate commerce. It criminalizes, as in this case, the mere possession of a machinegun independent of any type of transfer. This provision does not regulate the channels of interstate commerce. Decisions like *Rambo* and the panel opinion, in holding otherwise, have distorted the channels of commerce rationale and are attempting to read a statute which does not exist.

Cases relying on the channels of commerce rationale also misplace emphasis on the temporal limit on the possession ban and the dangerousness of the product. Neither of these characteristics more closely aligns § 922(o) with a regulation of the channels of interstate commerce. The grandfather clause of the ban applies it only to machineguns manufactured or imported after May of 1986, but that feature fails to enhance its relation to interstate commerce.*************** After 1986, both interstate and wholly intrastate private possessions are prohibited, yet there are no Congressional findings that this drastic impact upon intrastate activity was connected to or mandated by a relation to the channels

***************The effect of the grandfather clause does, paradoxically, assure a nexus between interstate commerce and criminal possession of pre-1986 *unlawfully* possessed machineguns, because, as this court's *Lopez* opinion noted, pre-1986 regulatory laws expressly embodied a jurisdictional nexus to commerce. *See Lopez*, 2 F.3d at 1356, n.29.

37

of interstate commerce. Similarly, the fact that machineguns are a dangerous commodity does not place them more or less within the channels of commerce for purposes of federal regulation. *United States v. Bishop*, 66 F.3d 569, 587 n.28 (3d Cir. 1995) ("The dangerousness of the object is not the source of Congressional power; the connection to interstate commerce is.") Baseball cards as well as toxic chemicals can be regulated by Congress only if there is a necessary relationship to interstate commerce. The argument based on dangerousness is more closely attuned to justifying a national police power than a national commerce power. *Lopez* reminded us that the Constitution does not confer a general police power upon the federal government. *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1634.

## 2. Things in Interstate Commerce

The flawed premise underlying regulating machineguns as "things in interstate commerce" is that they are by their nature a commodity "transferred across state lines for profit by business entities." *Wilks*, 58 F.3d at 1521 (citation omitted). We agree again with the Seventh Circuit's criticism of this reasoning, because "the regulation is much broader than the category." *Kenney*, 91 F.3d at 889. The second *Lopez/Perez* category, as previously explained, includes regulations of instrumentalities or things -- such as interstate transportation rates and safety regulations -- whose nexus to interstate commerce is obvious. Thus, again to quote *Kenney*:

> The *Wilks* court's observation that "[t]he interstate flow of machineguns 'not only has a

38

> substantial effect on interstate commerce; it
> *is* interstate commerce,'" 58 F.3d at 1521
> [(quoting *United States v. Hunter*, 843 F.
> Supp. 235, 249 (E.D. Mich. 1994)) (emphasis in
> original)], is correct as far as it goes, but
> it does not address the different question of
> the propriety of § 922(o)'s regulation of
> intrastate possession and transfer.

91 F.3d. at 889.

Criminal possession of a machinegun after May 19, 1986 under § 922(o) is not dependent on or related to the movement of the machinegun in interstate commerce, and it is **not** "bound up with interstate attributes." *Wilks*, 58 F.3d at 1521. Further, not all commerce is interstate commerce, as commerce "which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other States" is not commerce within the meaning of the Commerce Clause. *Gibbons v. Ogden*, 22 U.S. 1, 194 (1824). The *Wilks* reasoning makes the things in commerce basis of Commerce Clause regulation limitless, contrary to its purpose.

Nor are we persuaded that § 922(o) can be upheld on the basis of legislative findings -- eighteen years old when § 922(o) was enacted -- contained in the Omnibus Act[*] and the Gun Control Act of 1968.[**] Cases such as *Wilks* have sought to enhance the things in commerce rationale by describing § 922(o) as an incremental development in a seamless web of federal firearm

---

[*]Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (1968).

[**]Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968).

regulation. *Wilks*, 58 F.3d at 1521-22. But as explained in detail by Judge Garwood's opinion in *Lopez*, all previous federal gun control laws have been expressly tied to the conduct of the firearms business, a business whose inter- and intra-state activities are clearly commercial. *See Lopez*, 2 F.3d at 1348-57. The Supreme Court in *Lopez* approved this court's reading of the general legislative history and pattern of previous federal firearms legislation, *Lopez*, __ U.S. at __, 115 S.Ct. at 1632, and refused to rest on Congressional findings from other statutes to justify § 922(q). *Id*. at __, 115 S.Ct. at 1632. Like the Supreme Court in *Lopez*, and unlike *Wilks*, we find reliance on Congressional findings from previous federal firearms legislation inappropriate to support the § 922(o) possession ban. *See Lopez*, 2 F.3d at 1357 n.31.

Reliance on findings from other legislation not only contradicts the Supreme Court, it is a misleading indicator of the relevant gun control law. The Congressional findings relating to FOPA indicate that the Act's purpose was to *secure* the rights of citizens to possess firearms and to ensure that no "*undue or unnecessary Federal restrictions*" are placed on citizens "with respect to the acquisition, possession or use of firearms." FOPA § 1(b)(2), 100 Stat. at 449 (emphasis added) (*quoting* Gun Control Act of 1968 § 101, 82 Stat. at 1213-14 (1968)).*************** Neither

***************Additionally, § 1 of FOPA contains Congressional findings that the rights of citizens "to keep and bear arms under the second amendment of the United States Constitution . . . require[s] additional legislation to correct existing firearms statutes and enforcement policies." FOPA § 1(b)(1)(A), 100 Stat. at

40

the language of § 922(o) nor its legislative history provides any indication that Congress viewed the prohibition on possession of machineguns as an essential part of a broader regulatory scheme or that Congress considered the relationship between the ban on possession of machineguns and interstate commerce.

In comparison to § 922(o), which lacks any reference to interstate commerce, Congress specifically tied other regulations enacted concurrently with § 922(o) to interstate commerce. FOPA § 102, 100 Stat. at 451-52.*************** Two other provisions contained in § 922 were amended and one new subsection was added to § 922(o). FOPA § 102, 100 Stat. at 451-53. Congress thus maintained the "basic jurisdictional structure" found in previous firearms legislation, which required the "licensing of all firearms

449.

***************Section 922(g) was amended to provide that it would be unlawful for certain persons (as defined by § 922(g)) - "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." FOPA § 102, 100 Stat. at 452.

Section 922(h) was replaced in its entirety and states: "It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment -- (1) to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or (2) to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." *Id*.

Section 922(n) was added to § 922 and provides: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate commerce." *Id*.

dealers and manufacturers, . . . and in all other instances [provided] an express nexus either to interstate commerce or to the activity of, or dealing with, federally licensed dealers or manufacturers. . . ." *Lopez*, 2 F.3d at 1354. Unlike § 922(o) and (q), these other regulations, however, are grounded in either Congress' taxing powers, or are expressly tied to interstate or foreign commerce. *Id*. at 1354-57. Neither the language of § 922(o) nor its legislative history supports a finding that the ban on possession of machineguns regulates only machineguns connected with interstate commerce. *See supra* part II.A. Section 922(o) stands isolated from the rest of the FOPA because it conspicuously lacks either a nexus to commerce or the support of findings that banning mere intrastate possession of machineguns is essential to effectuate federal regulation. Section 922(o) cannot be upheld as a permissible regulation of a "thing" in interstate commerce.***************

**B.    Does § 922(o) "Substantially Affect" Interstate Commerce?**

The essential question in this case as in *Lopez* becomes whether § 922(o) represents a valid exercise of Congressional authority to regulate an activity "substantially affecting"

***************Section 922(o) also does not regulate an "instrumentality" of interstate commerce. Like § 922(q) in *Lopez*, § 922(o) regulates mere possession of a machinegun, regardless of its movement in interstate commerce. *See Lopez*, __ U.S. at __, 115 S.Ct. at 1630; *see also Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359 (1971)(aircraft are instrumentalities); *Shreveport Rate Cases*, 234 U.S. 342, 351, 34 S.Ct. 833, 836 (1914)(interstate carriers are instruments of interstate commerce). Section 922(o) therefore fails to regulate an instrumentality of interstate commerce.

42

interstate commerce. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1630.

The Government contends that § 922(o) has the requisite effect, as it is part of a comprehensive approach to the regulation of machineguns and that a single intrastate possession or transfer of a machinegun is nationally significant because of the cumulative effect such a transaction has on the supply-and-demand for machineguns. In a similar vein, *Kenney* argues that both the nature of § 922(o) and the history of federal firearms legislation support the provision's consistency with the post-*Lopez* scope of the Commerce Clause. *Kenney* first analogizes the banning of private post-1986 machinegun possession to the farmer's harvest of excessive wheat in *Wickard v. Filburn*, 317 U.S. at 125, 63 S.Ct. at 89, and concludes, ". . . there is a rational basis to regulate the local conduct of machinegun possession, including possession resulting from home manufacture, to effectuate § 922(o)'s purpose of freezing the number of legally possessed machineguns at 1986 levels, an effect that is closely entwined with regulating interstate commerce." 91 F.3d at 890. *Kenney* also describes the possession ban as rooted in a sixty-year history of federal machinegun regulation and thus as an incremental step in federal firearms regulation; it is a measure commanding "deference to Congress's accumulated institutional expertise." *Id*.

Among the three elements of *Lopez*'s substantial effects test, the first and most critical is that of characterization:

43

whether § 922(o) fulfills the mission of regulating interstate commerce as (1) a regulation of economic activity which, although itself local, has substantial effect on interstate commerce, or (2) a regulation of activity which is essential to maintaining a larger, interstate regime of economic regulation. Neither *Kenney* nor the government in supporting § 922(o) has characterized it as a regulation of economic activity. It is not. It is "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*,___ U.S. at ___, 115 S.Ct. at 1630-31.

Defenders of § 922(o) argue instead that the possession ban is an essential part of the regulation of "commercial activity," either to insure federal control of the market for machineguns or to enforce a freeze on the number of available machineguns. *See, e.g. Beuckelaere*, 91 F.3d at 785; *Kenney*, 91 F.3d at 890. No doubt Congress has undertaken fully to regulate the business of firearms dealing, insofar as sales and transfers in or affecting commerce are concerned.*************** But as we have repeatedly noted, mere intrastate possession of a machinegun does not necessarily involve a transfer or an economic transaction of any kind.***************

***************

***************See generally Lopez*, 2 F.3d 1342, 1348-1360 (Garwood, J.), reciting the history of federal firearms legislation.

***************Taking a different slant at the substantial effects test, Judge Higginbotham's novel approach to the test pays verbal obeisance to *Lopez* while seriously undermining it. Judge Higginbotham posits that rational basis review should lead federal courts to uphold the possession ban based on "facts ... within our [judges'] easy reach." Lacking any data from the legislative

44

Moreover, the analogy to *Wickard* is flawed.  In *Wickard*, the government's agricultural program aimed to control and support prices in the wheat market.  Filburn's consumption of home-grown wheat substituted for the controlled wheat, impairing to that extent the price support effort.  Section 922(o), by contrast, intends to extirpate any domestic commercial market for machineguns manufactured or imported after 1986.  Even if this goal constitutes a legitimate regulation of interstate commerce, it does not follow that criminalizing purely private, intrastate possession is necessary to eliminate the market.  Section 922(o) also prohibits transfers of machineguns and, to the extent it represents a permissible exercise of Commerce Clause power,*************** that prohibition aims directly and completely at commercial activity in machineguns.  Private possession of a machinegun does not involve a market activity, and there is no legitimate market in which a substitution effect would occur.

---

process, his opinion stitches together bits of news articles, statistics, and Congressional testimony from unrelated hearings to conclude that Congress might have banned machinegun possession to stem the illegal drug trade.  His is an interesting empirical creation, but methodologically it follows Justice Breyer's <u>dissent</u> in *Lopez*.  More troubling, Judge Higginbotham's opinion begs the question:  it never explains why banning the wholly intrastate, non-crime-related, noncommercial personal possession of a machinegun is reasonably or substantially necessary to control use of these firearms in the illegal drug trade or other interstate commerce.  Unlike the *Lopez* majority, his opinion ultimately substitutes wholesale deference to Congress for any attempt to define the boundaries of the commerce clause, even in noncommercial criminal statutes like § 922(o).

     ***************Not all transfers are commercial in nature. Transfers by gift or by succession would not be.

Another way of explaining the superfluousness of the § 922(o) ban on possession is to compare firearms regulation to the narcotics trafficking laws. Not only are most of those criminal provisions also expressly tied to the commerce in illegal controlled substances, but Congress also made extensive findings to establish the necessary relationship of possession and intrastate trade to the overall scheme. *See, e.g., United States v. Leshuk*, 65 F.3d 1105, 1112 (4th Cir. 1995); *Lopez*, 2 F.3d at 1367, n.51; *United States v. Lopez*, 459 F.2d 949, 951-53 (5th Cir.), *cert. denied sub nom. Llerena v. United States*, 409 U.S. 878, 93 S.Ct. 130 (1972).**************** The nature of controlled substances supports Congress's findings: they are fungible, and their intrastate, interstate or imported origin is often impossible to discern.

****************<em>See United States v. Genao</em>, 79 F.3d 1333 (2d Cir. 1996) (upholding 21 U.S.C. §§ 841, 846); *United States v. Leshuk*, 65 F.3d 1105 (4th Cir. 1995) (21 U.S.C. § 841(a)(1)); *United States v. Clark*, 67 F.3d 1154 (5th Cir. 1995) (upholding 21 U.S.C. § 860), *cert. denied*, ___ U.S. ___, 116 S.Ct. 1432, 134 L.Ed.2d 554 (1996); *United States v. Tucker*, 90 F.3d 1135 (6th Cir. 1996) (same); *United States v. Bell*, 90 F.3d 318 (8th Cir. 1996) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Brown*, 72 F.3d 96 (8th Cir. 1995) (same); *United States v. Yoon*, No. 95-16698, 1996 WL 367621 (9th Cir. June 28, 1996) (unpublished per curiam) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995) (upholding 21 U.S.C. §§ 841(a)(1), 846); *United States v. Kremetis*, 903 F. Supp. 250 (D.N.H. 1995) (same); *United States v. Smith,* 920 F. Supp. 245 (D.Me. 1996) (upholding 21 U.S.C. §§ 841(a)(1)-(2), 846); *United States v. Salmiento*, 898 F. Supp. 45 (D.P.R. 1995) (upholding 21 U.S.C. § 860); *United States v. Gonzalez*, 893 F. Supp. 935 (S.D. Cal. 1995) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Garcia-Salazar*, 891 F. Supp. 568 (D. Kan. 1995) (upholding 21 U.S.C. § 860); *United States v. Murillo*, No. CR 93-20131 JW, 1995 WL 621797 (N.D. Cal. 1995) (upholding 21 U.S.C. §§ 841(a), 843(b), 846); *United States v. Grafton*, 1995 WL 506001 (N.D. Ga. 1995) (upholding 21 U.S.C. §§ 841, 846); *United States v. Walker*, 910 F. Supp. 837 (N.D.N.Y. 1995) (upholding 21 U.S.C. §§ 841, 846, 848); *United States v. Bramble*, 894 F. Supp. 1384 (D. Haw. 1995) (upholding 21 U.S.C. §§ 841(a)(1), 844(a)).

Firearms, including machineguns, are identifiable and traceable. Banning private, intrastate machinegun possession is not an essential link in the chain of federal regulation of firearms dealing.

*Kenney* also asserts that because Congress has historically regulated firearms and has evinced particular interest in regulating machineguns, its "accumulated institutional expertise" justifies § 922(o). This argument might be called "the nose under the camel's tent" theory of Commerce Clause power: once Congress has begun to regulate a particular activity, courts should defer to any extensions of regulation that Congress legislates. Surely this position renders any theoretical limit on the enumerated Commerce Clause power nugatory.

Because we have concluded that mere intrastate possession is neither an economic activity nor an intrastate activity whose regulation is essential to a larger commercial regulatory regime, § 922(o) cannot pass muster under the *Lopez* substantial effects test. Reinforcing this conclusion, although not necessary to it, are the results of the other two parts of the test, which deal with Congressional findings and the limits on federal authority.

If Congress had made findings explaining the connection of mere intrastate possession of machineguns to interstate commerce, or if there were an expressly required nexus between such possession and commerce,*************** § 922(o) might be vindicated

---

***************We are not at liberty to question the Supreme Court's approval of the predecessor statute to 18 U.S.C. § 922(g)(1), which criminalizes possession of a firearm by a felon "in or affecting

47

under the second *Lopez* prong. These features are lacking. Whatever the effect a single intrastate possession of a machinegun has on economic activity in firearms, the text and legislative history of § 922(o) do not support any conclusion that Congress considered such effects or viewed § 922(o) as part of a comprehensive approach to federal regulation of commerce in machineguns. As discussed previously, § 922(o) was inserted into FOPA with virtually no discussion of its content and with absolutely no discussion of its place in the broad scheme of federal firearms regulations. *See supra* part II.A. Like § 922(q) found unconstitutional in *Lopez*, no Congressional findings attest that § 922(o) is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, __ U.S. at __, 115 S.Ct. at 1631. No studies, testimony or evidence of any other sort -- Congressional or otherwise -- is adduced in favor of § 922(o). Nor does § 922(o) contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id*. at __, 115 S.Ct. at 1631. To infer in the face of this void that regulation of intrastate possession is essential to effectively regulate

---

commerce." Only a minimal jurisdictional nexus is required, i.e. that at some time the firearm had travelled in interstate commerce. *Scarborough v. United States*, 431 U.S. 563, 575, 97 S.Ct. 1963, 1969 (1977). As this broad reading of the Commerce Clause has Supreme Court inprimatur, albeit pre-*Lopez*, we can only note the tension between the two decisions and will continue to enforce § 922(g)(1). *See United States v. Rawls*, 85 F.3d 240, 243 (5th Cir. 1996) (Garwood, J., specially concurring).

interstate traffic in machineguns states a naked conclusion, a fiat without supporting facts. Congress has not helped us to discern a connection between the possession ban and interstate commerce which is otherwise invisible to the naked eye. *Lopez*, ___ U.S. at ___, 115 S.Ct. at 1632.

Finally, like § 922(q), § 922(o) intrudes upon the traditional police powers of the states and violates *Lopez*'s third mandate for a substantial-effects regulation of intrastate activity because it affords no logical demarcation between the national and local interests. *Brecht v. Abrahamson*, 507 U.S. 619, 635, 113 S.Ct. 1710, 1720 (1993)(states have primary authority for defining and enforcing criminal law); *see Lopez*, __ U.S. at __, 115 S.Ct. at 1631 n.3; *Bass*, 404 U.S. at 349-50, 92 S.Ct. at 523-24. Section 922(o) would punish a local resident for the mere possession of a machinegun acquired after 1986 with "no requirement that his possession of the [machinegun] have any concrete tie to interstate commerce." *Lopez*, __ U.S. at __, 115 S.Ct. at 1634. The Supreme Court avoided such a result in *Bass*. *Bass*, 404 U.S. at 349-50, 92 S.Ct. at 523-24. To uphold § 922(o), a purely criminal law, with no nexus to interstate commerce, whose enforcement intrudes upon traditional police powers of the states, would convert the commerce power into a reserved "general federal police power." *Id*. at 1632-33; *see also id.* at __, 115 S.Ct. at 1638 (Kennedy, J., concurring)("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities,

the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."). The rationale that Congress can, on a blank slate, criminalize possession under the interstate Commerce Clause in order to regulate "the demand side of the market" can be applied to the possession of anything. Following *Lopez*, § 922(o) cannot be upheld as a regulation which substantially affects interstate commerce.

## CONCLUSION

Regardless of one's view of the wisdom of banning the private possession of machineguns, the question before this court is whether the Commerce Clause grants Congress the authority to ban private, intrastate possession of a machinegun with no showing that the prohibition is connected in any way to interstate commerce or is part of a broader federal regulatory scheme. Congress's commerce powers are broad, reaching even Roscoe Filburn's wheat field in Ohio. *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82 (1942). *Lopez*, however, closely controls this case. *Lopez* does not permit Congress, acting pursuant to the Commerce Clause, to criminalize the mere intrastate possession of machineguns without some indication that the possession ban is necessary to the regulation of, or has some other substantial tie to, interstate commerce. Section 922(o)'s ban on the mere possession of a machinegun exceeds Congress's authority under the Commerce Clause.